IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

BYRON C. WARREN,
individually and as Trustee
of the Warren Family Trust                                                          PLAINTIFF

v.                               No. 3:15-CV-03054

JEANETTE HOLLAND and
WILLIS OF ILLINOIS, INC.                                                         DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

Currently before the Court are Defendants Jeanette Holland's and Willis of Illinois, Inc.'s ("Willis") joint Motion for Summary Judgment (Doc. 50) and supporting documents (Docs. 51-52); Plaintiff Byron C. Warren's Response in Opposition (Doc. 54) and supporting documents (Docs. 55-56); and Defendants' joint Reply (Doc. 57). Defendants also filed a Motion to Strike (Doc. 58) the affidavits of Mr. Warren and expert witness, Dr. Lawrence S. Powell. Both affidavits were attached to Mr. Warren's Response in Opposition to the Motion for Summary Judgment. For the reasons set forth herein, Defendants' Motion for Summary Judgment (Doc. 50) is **GRANTED IN PART AND DENIED IN PART**, and their Motion to Strike (Doc. 58) is **DENIED**.

**I. BACKGROUND**

Byron C. Warren, individually and as Trustee of the Warren Family Trust,[1] filed this lawsuit on June 11, 2015, in the Circuit Court of Baxter County, Arkansas. *See* Doc. 3. The case was removed to this Court by Defendants on July 17, 2015, due to the presence

---

[1] The Warren Family Trust owns the Arkansas residence that is the subject of this lawsuit.

1

of complete diversity of citizenship and the satisfaction of the minimum amount in controversy required by 28 U.S.C. § 1332(a).  *See* Doc. 1.  The case then proceeded through the initial pleading stage, and on September 30, 2015, Mr. Warren filed an Amended Complaint (Doc. 21), alleging a claim for negligence against both Ms. Holland and Willis, and claims for breach of implied and express contract and breach of implied and express warranty against Willis alone.  Ms. Holland, who is employed by Willis, was Mr. Warren's insurance agent.  According to the Amended Complaint, Ms. Holland recommended that Mr. Warren purchase a High Value Homeowners Policy from Travelers Home and Marine Insurance Company (the "Travelers Policy") to insure his vacation home in Mountain Home, Arkansas.

While Mr. Warren was not present in Arkansas, his vacation home there suffered water and mold damage due to a ruptured steam line fitting.  The Travelers Policy of insurance contained an exclusion for loss caused by water leakage occurring over a period of 14 days or more ("the 14-day exclusion").  The Travelers Policy also contained an exclusion for loss caused by fungi, other microbes, or rot.  Mr. Warren did not discover the water and mold damage until May 20, 2014, which he concedes was more than 14 days after the water leakage began.  Travelers ultimately denied coverage, *see* Doc. 21-2, despite the fact that Defendants, according to the Amended Complaint, "at all times during the period the claim was pending, assured the Plaintiff that the damage was covered under the Travelers policy."  (Doc. 21, p. 3).

Mr. Warren does not dispute Travelers' denial of his insurance claim based on the two exclusions in the Travelers Policy.  Instead, he brings his lawsuit against Ms. Holland and Willis on the theory that, due to his approximately 40-year relationship with Willis and

its predecessor companies and agents, Defendants were so familiar with his personal insurance needs that they either knew or should have known that Mr. Warren traveled extensively and was away from his residence in Arkansas for extended periods of time. He maintains that in reliance on this special relationship between himself and Defendants, he purchased the Travelers Policy that had been recommended to him by Ms. Holland on or about August 5, 2010, and he allowed the Policy to be renewed annually thereafter. He further maintains that the Travelers Policy was completely inappropriate for a vacation home that was vacant for extended periods of time, a fact that Defendants either knew or should have known based on their long relationship with Mr. Warren and intimate knowledge of his personal and business properties.

Mr. Warren began procuring policies of insurance for his various properties in the mid-1970s from an agent named Dick Miles, with whom Mr. Warren was personally acquainted. Mr. Miles worked for the Bartlett Agency, which was acquired in 1996 by an insurance brokerage firm called Hilb, Rogal, and Hobbs of Chicago ("HRH"). *See* Braeke Depo., Doc. 52-4, p. 2. Even after the Bartlett Agency was acquired by HRH, Mr. Miles served as HRH's office president until 1999, and he continued to manage Mr. Warren's insurance needs. *Id.* at p. 4. At some point, insurance agent Tammy Sullivan, who was first employed at the Bartlett Agency and continued her employment at HRH, took over Mr. Warren's accounts from Mr. Miles, while Mr. Miles served as her supervisor. Ms. Sullivan procured the original policy of insurance that covered the Arkansas home when it was first built or purchased. That policy of insurance was issued through The Hartford ("Hartford Policy"), and it did not contain a 14-day exclusion for water damage. *See* Powell Depo., Doc. 55-7, p. 5.

On October 1, 2008, HRH merged with Willis and began operating out of the Moline, Illinois office. Ms. Holland began working at Willis as a personal lines broker in April of 2008, under the supervision of Ms. Sullivan, and Ms. Holland took over Mr. Warren's accounts.[2] At around that time, the Hartford Policy came up for renewal, and Mr. Warren requested that Willis research the possibility of acquiring different, comparable insurance coverage for his Arkansas residence. Mr. Warren stated in his deposition that, at the time, he was looking for a policy that was competitively priced, met his needs, and at the same time was with "a good, stable company." (Warren Depo., Doc. 52-2, p. 18).

The parties dispute whether Ms. Holland presented Mr. Warren with any policy recommendation other than the Travelers Policy. Defendants contend that Mr. Warren often ignored Ms. Holland's recommendations concerning homeowner's insurance options. Mr. Warren, on the other hand, testified that Ms. Holland offered him only one option for insuring his Arkansas home once his Hartford Policy came up for renewal: the Travelers Policy. Further, Mr. Warren claims that he trusted Ms. Holland and Willis to understand his insurance needs and offer him a comparable policy of insurance to the one he already had. In Mr. Warren's view, the water damage that his Arkansas home suffered in 2014 would have been covered under the original Hartford Policy, since that Policy did not contain a 14-day reporting exclusion for water damage. The Travelers Policy contained the exclusion, and thus was not comparable to the Hartford Policy and should not have been recommended for purchase. He also argues that, despite the fact that the Bartlett

---

[2] Mr. Miles was also working in the Moline office at that time, along with Ms. Sullivan and Ms. Holland. Ms. Holland testified that Mr. Miles did not retire until 2011. *See* Holland Depo., Doc. 54-6, p. 5.

Agency changed hands over the years, the same insurance agents in the same Moline office worked closely together to service his accounts, and they should have been familiar with his properties and business needs after such a long relationship.

For Ms. Holland's part, she admits she never read Mr. Warren's Hartford Policy, *see* Holland Depo., Doc. 54-6, p. 6, and she did not compare the terms and exclusions of the Hartford Policy to the Travelers Policy prior to recommending that Mr. Warren purchase the Travelers Policy. Mr. Warren contends that he relied on the relationship between himself, Ms. Holland, and Willis in deciding to take Ms. Holland's advice and purchase the Travelers Policy; and he further contends that if he had known the Travelers Policy contained a 14-day reporting requirement for water damage, he never would have purchased it. *See* Warren Depo., Doc. 52-2, p. 22.

Defendants point out in support of their Motion for Summary Judgment that Mr. Warren could not have had a special relationship with Ms. Holland because he never met her in person, and spoke with her only by telephone about once a year in the six years that she was his broker. Moreover, Defendants argue that Mr. Warren had no "reason to believe any other representative of Willis or its predecessors, including HRH, provided information related to the status, occupancy, vacancy, or supervision of the [Arkansas] Property to Ms. Holland when she began assisting him with placements in 2008." (Doc. 56, p. 9 (citing to Mr. Warren's deposition)). Mr. Warren disputes Defendants' contentions and points out that Ms. Holland knew or should have known that his Arkansas home was a vacation home that was not continuously occupied, since Mr. Warren's original broker, Mr. Miles, knew that fact, and Ms. Sullivan, his second broker, also knew that fact and was Ms. Holland's supervisor.

5

Mr. Warren also cites to evidence to prove that Ms. Holland and Ms. Sullivan actually knew that the Arkansas home, was, in fact, a secondary home, at or around the time Ms. Holland recommended that Mr. Warren purchase the Travelers Policy. *See* Doc. 54-8 (email to Ms. Sullivan from May 25, 2004, discussing Arkansas home is a secondary home); Doc. 54-9 (email to Ms. Holland from Willis employee Kim Heald, dated August 16, 2010, noting that Mr. Warren expressed in a telephone conversation that "he wanted his policies the way they were with Hartford[,] that is his IL home . . . as his primary and Arkansas as his secondary"); Doc. 54-10 (notice from Travelers to Mr. Warren and Willis, dated July 29, 2011, and noting that the property insured is a "secondary home"). Attached to the Amended Complaint is an email from Ms. Sullivan, dated March 7, 2005, that indicates she knew that Mr. Warren would leave the country for periods of time. *See* Doc. 21-4.

Focusing now on the claims in the Amended Complaint, the Court will begin with Count I's charge of negligence. In the Motion for Summary Judgment, Defendants admit that "Arkansas courts recognize a very narrow exception to the limited duties of insurance brokers where there is a 'special relationship between the agent and the insured.'" (Doc. 51, p. 4 (quoting *Buelow v. Madlock*, 206 S.W.3d 890, 893 (Ark. Ct. App. 2005))). But Defendants attempt to set the start-date of this special relationship in 2008, when Willis merged with HRH and Ms. Holland began managing Mr. Warren's account. By contrast, Mr. Warren sets the start-date of the alleged special relationship in the mid-1970s, when he first started buying policies of insurance from Mr. Miles at the Bartlett Agency.

Defendants also maintain that Mr. Warren wrongly assumes that Mr. Miles shared relevant details about the nature of Mr. Warren's properties with other agents at the Bartlett

6

Agency/HRH/Willis—including with Ms. Sullivan, who took over the account from Mr. Miles, and with Ms. Holland, who took over the account from Ms. Sullivan. Mr. Warren admitted in his deposition that he never had a direct conversation with Ms. Holland about the fact that his Arkansas home was a vacation home that he only occupied four months out of the year, nor that he left the water on in the home when it was vacant. *See* Warren Depo., Doc. 52-5, pp. 22-23. Defendants argue that if they owed Mr. Warren a particular duty of care based on a special relationship, their alleged negligent acts were not the proximate cause of Mr. Warren's losses, since Mr. Warren was obligated to read his own policies and educate himself as to its provisions, while Willis "did not have a duty to advise Plaintiff as to the sufficiency of the coverage available under the [Travelers] Policy, and they certainly did not have a duty to advise and secure coverage for every possible contingency." (Doc. 51, p. 8). Finally, Defendants contend that any negligence claim is barred by the three-year statute of limitations, which began to run when Mr. Warren first purchased the Travelers Policy in September of 2010, not when he learned his water-damage claim would be denied by Travelers.

As for Mr. Warren's causes of action for breach of contract and breach of warranty, which appear in Counts II-V of the Amended Complaint, Defendants maintain that the "Client Bill of Rights" (Doc. 52-7) that Willis holds out as containing the principles that guide its actions with respect to its clients, is not a true contract or warranty, nor was it incorporated into any other contract brokered by Willis on Mr. Warren's behalf. Mr. Warren admitted that he never saw this Client Bill of Rights before purchasing the Travelers Policy, and he never received the Client Bill of Rights from Willis, along with a copy of any policy of insurance or other document. *See* Warren Depo., Doc. 52-2, p. 28. He admits instead

7

that he only became aware of the existence of the Client Bill of Rights while he was browsing the Willis website sometime after he purchased the Travelers Policy, although he does not recall the exact date. *Id.*[3] The Client Bill of Rights was apparently posted on the website for any client—or any interested member of the public—to view. Mr. Warren does not allege that Willis sent the Client Bill of Rights to him by electronic means or discussed the document and its contents with him.

Considering these undisputed facts, Defendants contend that Mr. Warren cannot rely on the Client Bill of Rights as the basis for either an express or implied contract, or an express or implied warranty, and thus, summary judgment should issue in Defendants' favor on all contract and warranty claims. Mr. Warren responds that he was entitled to rely on the promises set forth in the Client Bill of Rights because Willis posted the document on its website, and therefore must have intended to be bound by the document. In addition, Mr. Warren observes in his Response brief that Ms. Holland in her deposition described her job title at Willis as "Client Advocate or Manager," which, in Mr. Warren's view, supports his argument that Ms. Holland and her employer intended her to be bound by the Client Bill of Rights.

As for Defendants' Motion to Strike, they focus on two affidavits that were attached to Mr. Warren's Response to the Motion for Summary Judgment. First, they argue that Dr. Powell's expert-witness affidavit should be stricken because it does not contain facts supported by evidence, but is composed solely of opinions, conjecture, legal conclusions,

---

[3] Later in his deposition, Mr. Warren revised his testimony to state that he first viewed the Client Bill of Rights on the Willis website "sometime after Willis merged [with HRH]." *See* Warren Depo., Doc. 52-2, p. 35.

and speculation, none of which is based on his personal knowledge and observation. *See* Doc. 58, p. 2. Second, Defendants argue that paragraph 6 of Mr. Warren's affidavit should be stricken because he states a legal conclusion that Defendants breached a duty of care. Below the Court will first take up the Motion to Strike, and then consider the Motion for Summary Judgment.

## II.  LEGAL STANDARD

### A.  Motion to Strike

Ordinarily, an affidavit that is offered to oppose a party's summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  If an affidavit does not demonstrate a basis for personal knowledge and contain admissible evidence, the affidavit is considered hearsay and may be stricken. *McSpadden v. Mullins*, 456 F.2d 428, 430 (8th Cir. 1972).  However, the above requirements only apply to the testimony of lay witnesses.  Expert witnesses are subject to different requirements.  Rule 703 of the Federal Rules of Evidence permits an expert to base his opinion on facts or data "that the expert has been made aware of or personally observed."  Fed. R. Evid. 703.  Further, these facts or data used in forming an opinion "need not be admissible for the opinion to be admitted [into evidence]."  *Id.*

### B.  Motion for Summary Judgment

The standard of review for summary judgment is well established.  Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

9

to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)).

In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

### III. DISCUSSION

### A. Motion to Strike[4]

The Court has reviewed Dr. Powell's affidavit (Doc. 54-3) filed in support of Mr. Warren's Response to the Motion for Summary Judgment. Dr. Powell purports to be an expert in the area of insurance. Although his affidavit references an attached CV listing his experience and qualifications, none is attached. Nevertheless, Defendants' Motion to Strike does not challenge Dr. Powell's expert qualifications in any respect, so the Court assumes that Defendants agree he is qualified to give expert opinions. The Motion to Strike claims that Dr. Powell's affidavit should be stricken because it is "not based on personal knowledge and contains inadmissible hearsay . . . ." (Doc. 58, p. 2).

Federal Rule of Evidence 703 provides as follows:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Accordingly, Dr. Powell may state opinions in his expert affidavit that are not based on personal knowledge, but rather are the product of facts or data that he "has been made aware of." Moreover, to the extent Defendants dispute Dr. Powell's opinion that the Hartford Policy did not contain a 14-day exclusion for water damage, this conclusion would

---

[4] Initially, Mr. Warren argues that the Court should not even consider the Motion to Strike, as it was filed without a supporting brief, in violation of Local Rule 7.3. The Court finds that any error on Defendants' part in not filing a separate brief was harmless, as the brief was incorporated within the Motion.

tend to go to the weight of the evidence, rather than to its admissibility. According to the information available to the Court thus far, Dr. Powell appears to be an expert qualified to offer opinions as to the relevant standard of care that insurance brokers adhere to in the industry. Therefore, his opinions as to whether or not Ms. Holland's actions met that standard of care constitute proper expert testimony. The Motion to Strike as to Dr. Powell's affidavit is therefore **DENIED**.

Defendants also move to strike paragraph 6 of Mr. Warren's affidavit (Doc. 55-5), arguing that it is nothing but a legal conclusion. The Court has reviewed the paragraph in question and disagrees with Defendants' interpretation. Mr. Warren's affidavit is proper, and the Motion to Strike as to paragraph 6 is also **DENIED**.

### B. Motion for Summary Judgment

#### 1. Negligence

The Court finds that genuine issues of material fact exist as to the claim in Count I for negligence, such that summary judgment is inappropriate. First, there are unresolved disputes of fact pertaining to Defendants' argument that the claim is untimely. The statute of limitations in Arkansas for professional negligence of an insurance agent is three years. *See Flemens v. Harris*, 323 Ark. 421, 423 (1996). The statute "begins to run, absent concealment of the wrong, on the date that the negligent act was committed, rather than the date that it was discovered." *Calcagno v. Shelter Mut. Ins. Co.*, 330 Ark. 802, 805 (1997) (citing *Flemens*, 323 Ark. at 427). The parties disagree about the last date any act of negligence may have been committed. Defendants argue that the only date when a cause of action for negligence could have accrued against them was in September of

2010, when they procured the Travelers Policy for Mr. Warren. According to Defendants, Mr. Warren's Policy was automatically renewed directly through Travelers in 2011, 2012, and 2013, and Defendants were not involved in that renewal process. Mr. Warren disagrees and presents evidence to show that Defendants had a hand in renewing the Travelers Policy each year. For example, on July 29, 2011, Mr. Warren received a letter of non-renewal from Travelers, see Doc. 55-10, that noted "the risk is a secondary home and [Travelers] do[es] not write the primary dwelling." In response to this non-renewal letter, Mr. Warren claims that Defendants affirmatively acted to assist him in obtaining Travelers insurance coverage for his primary home, which was then located in Illinois, and did so in order to keep his coverage for his secondary home in Arkansas intact. Then, during the renewal process in 2013, Mr. Warren requested that Ms. Holland inquire about raising the deductible on the Travelers Policy. In a letter addressed to Mr. Warren, dated September 13, 2013, Ms. Holland responded to his request, informing him that she asked Travelers to increase the deductible. See Doc. 55-12. All of these circumstances create a genuine, material dispute of fact as to when the last alleged act of professional negligence was committed with respect to the Travelers Policy covering Mr. Warren's Arkansas home. For this reason, Defendants' statute of limitations defense to the negligence claim presents a fact issue that must be submitted to a jury.

With respect to the substance of the negligence claim, other genuine, material disputes of fact exist as to whether Defendants had a special relationship with Mr. Warren, so as to warrant the expectation of an added duty of care not otherwise applicable in the insurance context. Professor Howard W. Brill, in writing on the law of damages in Arkansas, explains that "[u]nder the common law a policy holder has a duty to educate

13

himself concerning matters of insurance, including the coverage available under different policies," and that an insurance agent "generally has no duty to advise or inform policy holders as to different coverages." 1 Howard W. Brill, Arkansas Practice Series: Law of Damages § 24:2, at 546 (6th ed. 2014). However, if a special relationship exists between the insured and his insurance agent, this "may place on the agent a higher duty to inform the insured." *Id.* at 547. "The existence of a special relationship presents a question of fact," and thus, renders this issue inappropriate for summary judgment. *Buelow*, 206 S.W.3d at 893 (quotation and citation omitted).

A jury reviewing the facts surrounding Mr. Warren's relationship with Ms. Holland, as well as with other agents employed by Willis and/or by Willis's corporate predecessors, could potentially find that the relationship spanned anywhere from 6 to 40 years. In addition, a jury could find that Ms. Holland, Ms. Sullivan, and/or other agents working for Willis and/or its predecessors, either knew or should have known that Mr. Warren's Arkansas home was not his primary residence, but was instead a vacation home that was not continuously occupied. As a consequence, a jury could then find that, given the parties' special relationship and Defendants' knowledge of Mr. Warren's business interests, Ms. Holland's recommendation of an insurance policy with a 14-day reporting requirement was negligent. Summary judgment is therefore **DENIED** as to this claim.

### 2. Breach of Express and Implied Contract and Breach of Express and Implied Warranty

According to the Amended Complaint, Mr. Warren's claims for breach of contract arise from Willis's general promise "to provide services to the Plaintiff for consideration" (Doc. 21, pp. 5-6). In Mr. Warren's view, those "services" were specifically defined in a

14

document called the "Client Bill of Rights," which Mr. Warren discovered when browsing Willis's website. Mr. Warren does not contend that the Client Bill of Rights was separately provided to him by Willis, either in hard copy or in an email, or along with other insurance policy documents. He does not even contend that he had a conversation with any agent or employee of Willis concerning the Client Bill of Rights, or that any other document he was provided by Willis specifically referenced the Client Bill of Rights.

Arkansas law allows an insured to assert a contract claim against his insurance agent, in addition to a tort claim, provided that the insured demonstrates "that an agreement existed by which the agent was to obtain insurance coverage, that a breach occurred, and that damage resulted." Brill, *supra*, at 547; *see also Life Plus Int'l v. Brown*, 317 F.3d 799, 805 (8th Cir. 2003) ("Arkansas law does not prohibit a party from pleading and proving both an action for breach of contract and an action in tort where the conduct supports both actions.").

The leading treatise on insurance law explains that a contractual relationship between an insurance agent and his client will ordinarily exist.

> In order for a person to become an agent for another in procuring insurance, or in matters relating to the insurance after the policy is effected, there must, of course, be a contract or agreement of employment, either express or implied. This contract or agreement may arise from express directions to insure on behalf of another, or the principal may directly empower another to act in all matters relating to insurances on his or her property, both before and after policies are effected. It is equally well settled that the authority to act as the agent may be implied from the relation of the parties or from the person's situation with reference to the property. It may also exist in cases of special emergency, or under peculiar circumstances necessitating immediate action, or by reason of a course of dealing, or by an adoption or ratification, or from possession of the policy.

3 Couch on Ins. § 44.1 (rev. ed. 2016).

15

In reviewing the Amended Complaint, Mr. Warren's alternative claims for breach of express and implied contract are not clearly explained. With that said, neither party on summary judgment provides sufficient briefing as to why these claims should either survive or be dismissed as a matter of law.[5] Certainly Mr. Warren is permitted to assert claims for both breach of express contract and breach of implied contract in his Amended Complaint, but "principles of contract law and the policy against double recovery would bar a recovery on both theories." Brill, *supra*, § 31:1, at 702. "Express contracts are created by express language, either oral or written"; whereas "[i]mplied contracts, whether in fact or in law, are created by the conduct of the parties or judicially created to prevent unjust enrichment." *Id.*, *supra*, § 17:1, at 344. After careful review, the Court finds as a matter of law that the agreement by Willis to provide certain insurance brokerage services to Mr. Warren was express; and therefore the Court need not go in search of disputed facts as to the existence of a mere implied agreement to procure insurance. Accordingly, Mr. Warren's alternative claim for breach of implied contract, as asserted in Count II of the Amended Complaint, is **DISMISSED WITH PREJUDICE**.

Regarding the nature of the express brokerage agreement between the parties, Mr. Warren does not contend that he signed a contract with Willis, or, indeed, with either of Willis's predecessors, HRH and the Bartlett Agency, that specifically set forth the terms of that agreement. Mr. Warren also does not contend that he engaged in oral or written

---

[5] Defendants devote only a single page of their 11-page brief in support of their Motion for Summary Judgment to discussing Mr. Warren's claims for breach of contract and breach of warranty. Mr. Warren's Response is similarly unhelpful. Only the last page of his 11-page brief touches upon both his contract and warranty claims, which make up four out of the five Counts in his Amended Complaint.

discussions with any Willis agent in which they talked about the services that Willis intended to provide to Mr. Warren, or otherwise defined the boundaries of their brokerage agreement. Instead, the evidence of an express brokerage agreement between the parties must be pieced together from certain facts in the summary judgment record. For example, the emails attached to the summary judgment briefing and the copy of the Travelers Policy together constitute evidence of an agreement for Willis to procure a policy of insurance on Mr. Warren's Arkansas home. Other evidence indicates that the parties expressly agreed that Willis would secure Travelers coverage for Mr. Warren's primary residence in Moline, Illinois, on or about July of 2011. *See* Doc. 55-10. Still other evidence shows that Willis and Mr. Warren expressly agreed that Willis would apply for an increase in the deductible on Mr. Warren's Travelers Policy in September of 2013. *See* Doc. 55-12.

There may be other evidence that further supports and explains the nature of the express brokerage agreement, including the Client Bill of Rights. The Court will not opine at this time as to whether the Client Bill of Rights does, or does not, constitute evidence of the parties' mutual understanding of their express brokerage agreement. The Court will leave that to the jury to decide. Regardless, there exists a genuine, material dispute of fact as to the terms of the parties' express agreement for insurance services, and as to whether Willis breached that agreement by recommending that Mr. Warren purchase a new policy of insurance for his Arkansas home that was not comparable to the policy covering the home at the time. Summary judgment as to Count III's claim for breach of express contract is therefore **DENIED**.

Turning now to Mr. Warren's breach of warranty claims, he argues in Count IV of the Amended Complaint that the Client Bill of Rights created an express warranty for Willis

17

to provide particular services and fulfill certain duties of care. In Count V, he maintains that the Client Bill of Rights created an implied warranty to provide those services. The Court observes that warranty claims are most often presented in relations to goods; however, Arkansas law recognizes express warranties may also apply to services. *See Capel v. Allstate Ins. Co.*, 78 Ark. App. 27, 36-37 (2002) (citing *Haase v. Starnes*, 323 Ark. 263, 272 (1996)). The Court is unsure whether Arkansas law would support a claim for an implied warranty for services, but in any event, the question is moot, as the Client Bill of Rights is not a warranty.

The law is clear that a common-law claim for breach of warranty sounds in contract. *Stein v. Lukas*, 308 Ark. 74, 79 (1992). Arkansas law requires, among other things, that a valid contract evidence mutual agreement and mutual obligations, and that those obligations be supported by legal consideration. *See Williamson v. Sanofi Winthrop Pharms., Inc.*, 347 Ark. 89, 98 (2001). Accordingly, no contractual obligation exists unless there is a "meeting of the minds" as to all material terms. *Id.* Considering these basic contract principles, the Client Bill of Rights is not contractual in nature, and thus is not a warranty, because there was no "meeting of the minds" concerning its terms, and Mr. Warren provided no consideration for the special duties and obligations set forth in the Client Bill of Rights.

Mr. Warren concedes that he only happened upon the Client Bill of Rights while he was exploring the Willis website online, and that his discovery occurred at some point after HRH merged with Willis—that is, after October 1, 2008. Crucially, Mr. Warren does not contend that he and Willis ever had a meeting of the minds concerning their mutual

understanding of the terms in the Client Bill of Rights. In other words, he never asserts in his sworn testimony or in his briefing on summary judgment that Willis affirmatively presented him with a copy of the Client Bill of Rights in either hard copy or electronic format; that Willis included a copy of the Client Bill of Rights along with any insurance documents provided to him; that any Willis documents referenced the Client Bill of Rights; or that he spoke with a Willis agent about the Client Bill of Rights at any point during the parties' brokerage relationship. He also failed to provide any separate consideration to Willis in support of the particular services, duties, and promises set forth in the Client Bill of Rights. Therefore, under these facts, the Client Bill of Rights is not a warranty Mr. Warren may enforce against Willis, and Counts IV and V for breach of warranty are **DISMISSED WITH PREJUDICE**.

## IV. CONCLUSION

In light of the above reasoning, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 50) is **GRANTED IN PART AND DENIED IN PART** as follows: summary judgment is **GRANTED** as to Counts II, IV, and V, and the claims for breach of implied contract, breach of express warranty, and breach of implied warranty are all **DISMISSED WITH PREJUDICE**; but summary judgment is **DENIED** as to Count I for negligence and Count III for breach of express contract.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike (Doc. 58) is **DENIED**.

**IT IS SO ORDERED** on this 8th day of November, 2016.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

19